IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EMERY M. SAMMONS | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 14-2419 |
| PHILADELPHIA GAS WORKS | : | |

## MEMORANDUM

**SURRICK, J.**                                                    **MARCH  23  , 2016**

Presently before the Court are Defendant's Motion for Summary Judgment (ECF No. 18),

Defendant's Supplemental Motion for Summary Judgment (ECF No. 34), and Plaintiff's Cross-

Motion for Summary Judgment (ECF No. 36).  For the following reasons, Defendant's Motions

will be granted in part and denied in part, and Plaintiff's Motion will be granted.

## I.    BACKGROUND

This action is a dispute over the circumstances under which Plaintiff Emery Sammons'

employment from Defendant Philadelphia Gas Works ("PGW") was terminated and the

enforceability of a settlement agreement into which the parties allegedly entered.

### A.    Employment Termination

Plaintiff began working for PGW, a regional municipally owned gas utility company, in

1981.  (Am. Compl. ¶¶ 6-7, ECF No. 27.)  Over the course of his approximately 30-year tenure,

Plaintiff served in various positions within PGW, including his final position as a non-union call

center supervisor.  (*Id.* at ¶¶ 8-13; Webb Aff. ¶ 11, ECF No. 19.)  Plaintiff's former direct

manager, Joseph Craig, stated that during his three-and-a-half years supervising Plaintiff, he was

never aware of Plaintiff leaving work without permission.  (Craig Dep. 131:9-21, ECF No. 20.)

Nevertheless, on April 8, 2013, Plaintiff met with Mr. Craig and proper clocking in and out

procedures were discussed.  (Am. Compl. ¶ 15.)  Later that day, Craig sent Plaintiff an email informing him that he was "required to punch in and out when [he] leave[s] the building for personal reasons that will clearly exceed a break or lunch period . . . ."  (Craig Apr. 8, 2013 email, ECF No. 19, Grant Aff. Ex. L.)  Such a Time Labor Management ("TLM") policy was memorialized in a writing dated March 1, 2009.  (HR Policies—Electronic Time Recording, Ambrose Aff. Ex. F, ECF No. 19.)   It required "[a]ll PGW non-union employees . . . to electronically record work start and stop times . . . ."  (*Id.*)

Even though a TLM policy was in place, it was not always enforced universally throughout PGW.  (Pl.'s Opp. Br. 10.)  Brenda Torres, a 43-year-old call center "manager," allegedly engaged in regular and known TLM abuse.  (Pl.'s Opp. Br. 9.)  Craig tried to initiate corrective action against Torres, but according to him, his supervisors did nothing about the complaints during his tenure.  (*Id.* at 9-10.)  Even Craig did not clock out and back in every time he left the building for personal reasons.  (Craig Dep. 8-12.)

Despite inconsistent enforcement, on October 24, 2013, Plaintiff was placed on administrative leave for violating PGW's TLM policy on the dates of August 28, 2013 and September 13, 2013.  (Am. Compl. ¶¶ 16-17; Security and Loss Prevention Mem.; Grant Aff. Ex. M.)  Plaintiff's absences were allegedly captured on video surveillance.  (Security and Loss Prevention Mem.)  Plaintiff investigated the matter on his own and determined that he had received permission from Craig for the absences on both dates.  (Am. Compl. ¶¶ 21, 25.)  A meeting to discuss the matter was scheduled for November 7, 2013, at 8:30 a.m.  (Webb Aff. ¶ 15.)  Ms. Lorraine S. Webb, PGW Vice President for Human Resources, personally called Plaintiff to stress the importance of the meeting and to remind him of the meeting time.  (*Id.* at ¶¶

16-17.)  Despite the warnings, Plaintiff was allegedly late to the meeting and was seen outside of the building socializing at the time the meeting was to begin.  (Cummings Aff. ¶ 19.)

PGW terminated Plaintiff's employment the next day for, among other reasons, failing to "record his absences by clocking 'in' and 'out' . . . ."  (Am. Compl. ¶¶ 27-28.)  Plaintiff was 58-years old at the time of his termination and contends that the alleged TLM violations are merely pretext for PGW's underlying age animus and desire to replace Plaintiff with a younger employee.  (*Id.* at ¶¶ 7, 67.)  He contends that PGW directors had a history of making age-related comments and treating younger employees more favorably than those that were older.  (Pl.'s Opp. Br. 9.)  As examples, Plaintiff offers that Gary Gioioso, PGW's Director of Organizational Development, once stated that Plaintiff "had been at PGW probably far too long," and another executive once asked "do you know how old [he] is?" about another employee over age 40.  (*Id.*)

### B.      The Settlement Agreement

In the termination letter that he received from Gioioso, Plaintiff was offered the opportunity to explore his "exit options" from the company.  (Am. Compl. ¶ 36.)  Shortly thereafter, the parties entered into negotiations for a settlement agreement and release of all claims.  (*Id.* at 40.)  By late December 2013, PGW had decided that it would rehire Plaintiff so that he could retire with a "30 and Out" pension, which would have entitled him to receive his vested pension benefits, as well as medical benefits.  (Webb Aff. ¶¶ 26-27, 30.)  After further negotiations and several written draft settlement agreements, a revised agreement was presented to Plaintiff's counsel by PGW.  (Am. Compl. ¶ 44; *see also* Dec. 31, 2013 Lebofsky email, ECF No. 34-4.)  An email sent by PGW's counsel on December 31, 2013 at 7:51 a.m. stated in part: "I need some method for you to review the revised agreement to enable your client to retire today and have it become effective tomorrow, January 1.  I will have to have your approval

3

before I present the revised agreement to Mr. Sammons." (Dec. 31, 2013 Lebofsky email.) That same day, Plaintiff met with PGW Benefits Administrators to present required documents and complete all necessary paperwork related to his retirement. (Am. Compl. ¶¶ 47-48; Dasch Aff. ¶ 8, ECF No. 19.)

The final settlement agreement was to be signed when Plaintiff met with PGW personnel the morning of December 31, 2013. However, the agreement was never fully executed. (Am. Compl. ¶¶ 49, 54.) PGW contends that because Plaintiff presented a divorce decree with a date that did not coincide with termination of his ex-wife's medical benefits, it decided not to offer Plaintiff the "30 and out pension" plan as it had originally intended. (Dasch Aff. ¶¶ 14, 20-21.) PGW policy required employees to terminate coverage for an ex-spouse within 30 days of divorce and provide a copy of the divorce decree. (June 22, 2003 Mem., Ambrose Aff. Ex. C.) Paperwork subsequently found in Plaintiff's employee file demonstrates that Plaintiff claimed his ex-wife as a dependent on a health care reapplication form in 2003, three months after his divorce was finalized. (*See* Healthcare Reapplication Form, ECF No. 18, Ex. B.) Plaintiff removed his wife as a medical plan beneficiary beginning September 1, 2006. (Countercl. ¶ 14.) On a 2009 work-related form, Plaintiff indicated that he was divorced. (Ambrose Aff. ¶ 24.) Upon learning that Plaintiff was divorced as of March, 2003, PGW immediately repudiated the settlement agreement and release without further negotiation (Am. Compl. ¶ 54; Dasch Aff. ¶¶ 12, 21.) PGW contends that any settlement agreement was void and/or voidable because it was never memorialized in a signed writing. It also contends that Plaintiff made fraudulent representations on which it relied.

### C.     Procedural History

In April 2014, Plaintiff filed this Complaint against PGW, alleging violation of the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*.  (ECF No. 1.)  PGW filed an Answer in June 2014, with a counterclaim alleging fraud by Plaintiff for keeping his ex-wife on his benefits plan from 2003 to 2006.  (ECF No. 4.)  On February 4, 2015, Plaintiff filed a Motion Pursuant to Rule 15(a) for Leave to File Amended Complaint (ECF No. 16) in which he requested permission to add a claim against PGW for breaching the alleged settlement agreement (Pl.'s Br. 10, Ex. A ¶¶ 90-92).  PGW filed a Response in Opposition to Plaintiff's Motion on February 16, 2015.  (ECF No. 17.)  We issued a Memorandum and Order granting Plaintiff's motion for leave to amend on March 20, 2015.  (ECF Nos. 25, 26.) [1]  On April 13, 2015, PGW filed its Answer to Amended Complaint, Affirmative Defenses and Counterclaim.  (ECF No. 29.)  Plaintiff filed an Answer and Affirmative Defenses to PGW's Counterclaim to Amended Complaint on July 21, 2015.  (ECF No. 41.)

On February 19, 2015, PGW filed its first Motion for Summary Judgment.  (Def.'s First Summ. J. Mot., ECF No. 18.)[2]  PGW filed a Supplemental Motion for Summary Judgment on May 11, 2015.  (Def.'s Supp. Summ. J. Mot., ECF No. 34.)  On June 5, 2015, Plaintiff filed a Response to PGW's Motions and a Cross Motion for Summary Judgment.  (ECF No. 36.)  On July 14, 2015, PGW filed a Response to Plaintiff's Cross-Motion for Summary Judgment.  (ECF No. 40.)

---

[1] In Plaintiff's initial Motion for Leave to Amend the Complaint, he requested permission to add several other claims, including claims pursuant to the Employee Retirement Income Security Act and the Pennsylvania Wage Payment and Collection Law.  (Pl.'s 15(a) Mot. 2, ECF No. 16-1.)  Plaintiff withdrew the request to file these claims.  (Pl.'s 15(a) Mot. Reply 2, ECF No. 23.)  A current and correct copy of the Amended Complaint was posted on the docket on March 20, 2015.  (ECF No. 27.)

[2] We denied as moot Defendant's first Motion for Summary Judgment on April 14, 2015. (ECF No. 30.)  We rescinded the order and reinstated the Motion on April 24, 2015.  (ECF No. 33.)

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party.  *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "[A] factual dispute is material only if it might affect the outcome of the suit under governing law."  *Id.*  The court must view the evidence in the light most favorable to the non-moving party.  *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).  However, "unsupported assertions, conclusory allegations, or mere suspicions" are insufficient to overcome a motion for summary judgment.  *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989)).

Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co*., 391 F.3d 497, 502 (3d Cir. 2004).  If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . .");  *see also Matsushita Elec. Indus. Co.*, *v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  "Where the record taken as a whole

6

could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

Where, as here, the parties each file motions for summary judgment, "Rule 56(c) does not mean that the case will necessarily be resolved at the summary judgment stage.  The court must consider the motions separately.  Each party must still establish that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Atl. Used Auto Parts v. City of Phila.*, 957 F. Supp. 622, 626 (E.D. Pa.1997) (citations omitted).

## III.     DISCUSSION

Plaintiff asserts claims for age discrimination (Count I) and breach of the settlement agreement (Count II).  PGW has filed a counterclaim alleging that Plaintiff made fraudulent misrepresentations in regard to a medical plan beneficiary.  PGW moves for summary judgment on all counts of the Complaint.  Plaintiff submits a cross-motion for summary judgment on PGW's counterclaim.

### A.     Age Discrimination (Count I)

In its Motion for Summary Judgment (ECF No. 18), PGW requests that judgment be entered in favor of Defendant and against Plaintiff on Plaintiff's claim under the ADEA in Count I of the Amended Complaint.

The ADEA states that "[i]t shall be unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . ." 29 U.S.C. § 623(a)(1).  PGW argues that Plaintiff has not offered sufficient evidence to support his claim under the ADEA.  Plaintiff contends that there is sufficient evidence in the record to raise a triable issue of fact.

As Plaintiff and PGW have noted in their respective briefs, claims of age discrimination proceed under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Snik v. Verizon Wireless*, 160 F. App'x 191, 193 (3d Cir. 2005); s*ee also Fakete v. Aetna, Inc.*, 308 F.3d 335, 337-38 (3d Cir. 2002) ("An ADEA plaintiff can meet [his] burden by (1) presenting direct evidence of discrimination . . . , or (2) presenting indirect evidence of discrimination that satisfies the familiar three-step framework of *McDonnell Douglas* . . . .").  Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  If the plaintiff meets this initial burden, the defendant can rebut this prima facie case by providing a legitimate, nondiscriminatory reason for its actions.  *Id.*  If the defendant meets its burden of production, the plaintiff must then demonstrate by a preponderance of the evidence that the defendant's proffered legitimate reason was a pretext for discrimination.  *Id.* at 804.

### 1.  *Plaintiff's Prima Facie Case*

To establish a prima facie case of discrimination in ADEA cases, a plaintiff must show that (i) the plaintiff was a member of the protected class, i.e., was 40 years of age or older; (ii) the plaintiff was discharged; (iii) the plaintiff was qualified for the job; and (iv) the plaintiff was replaced by a sufficiently younger person or a younger, similarly situated employee was treated more favorably, creating a reasonable inference of age discrimination.  *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1108 (3d Cir. 1997) (citations omitted); *see also Steward v. Sears Roebuck & Co.*, 231 F. App'x 201, 210 n.5 (3d Cir. 2007) (reasoning that evidence demonstrating more favorable treatment of "significantly younger," "similarly situated employees" could be used to satisfy the fourth element).  "[T]he prima facie case under the *McDonnell Douglas-Burdine* pretext framework is not intended to be onerous."  *Sempier v.*

*Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  PGW contests only the fourth element of the prima facie case.  (Def.'s First Summ. J. Mem. 9.)

Here, Plaintiff contends that he was treated differently than other call center employees and supervisors because they were never disciplined or terminated for TLM violations.  (Pl.'s Opp. Br. Ex. A ¶¶ 40-42, ECF No. 36.)  Plaintiff points to Brenda Torres, the 43-year-old call center "manager," who allegedly engaged in regular and known TLM abuse without incident.  (*Id.* at ¶ 42; Pl.'s Opp. Br. 9.)  Plaintiff asserts that he was "terminated for the same reasons Brenda Torres was allowed to continue working."  (Pl.'s Opp. Br. 10.)  However, during his deposition testimony, Plaintiff could not recall specific incidences in which Torres engaged in time infractions, other than that she was unavailable for certain meetings.  (Sammons Dep. 92:11-24.)  Moreover, Torres' employment was terminated on November 14, 2013, six days after PGW terminated Plaintiff's employment.  (Gioioso Aff. ¶ 7, Affs. in Supp. Def.'s First Summ. J. Mot., ECF No. 19.)  Torres' termination was based, in part, upon Torres ignoring PGW's security procedures.  In addition, approximately two years prior to Plaintiff's termination, a PGW Customer Affairs Supervisor who was 18 years younger than Plaintiff was terminated, in part, for violations of PGW's TLM policy.  (Def.'s First Summ. J. Mem. 10; Giosio Aff. ¶¶ 9-13.)  We are mindful of the Third Circuit's admonition that establishing a prima facie case "is not intended to be onerous."  *Sempier*, 45 F.3d at 728.  However, other than offering the bald assertion that younger employees were not disciplined for TLM violations, Plaintiff has failed to raise any specific facts that would lead us to believe that similarly situated employees were treated more favorably than he.  The primary employee on which Plaintiff relies was also

terminated.  We are satisfied that Plaintiff has not established the fourth element of a prima facie case of age discrimination.

### 2.   *PGW's Reason for its Actions*[3]

PGW states that Plaintiff was fired for violating PGW's TLM policy and for being late to a meeting in which Plaintiff was to receive written warning for such violations.  (Def.'s First Summ. J. Mem. 15.)  PGW HR Vice President Lorraine S. Webb left two separate voicemail messages on Plaintiff's home phone line to stress the importance of showing up on time to the meeting.  (*Id.* at 14-15; Webb Aff. ¶¶ 15-16.)  Despite the reminders, Plaintiff was allegedly late to the meeting because he was outside of the building socializing with other people.  (Cummings Aff. ¶ 19.)  PGW asserts through its various executives that because Plaintiff was found to be "stealing time" and showed a lack of concern for keeping his job, his employment was terminated.  (Cummings Aff. ¶ 20; Gioioso Aff. ¶ 10; Webb Aff. ¶ 25.)  Plaintiff's alleged failure to clock out when leaving the work premises for extended periods of time subjected him to discipline "including discharge" according to official PGW policies and procedures.  (*See* Elec. Time Rec. Policy, Ambrose Aff. Ex. F.)  Plaintiff was provided with a written reminder of this policy on April 8, 2013.  (Grant Aff. Ex. L.)  Plaintiff was observed violating the policy on two subsequent occasions.  (*Id.*)  We are satisfied that PGW's reasons for terminating Plaintiff's employment are legitimate and nondiscriminatory.

### 3.   *Whether PGW's Proffered Legitimate Reason was a Pretext for Discrimination*

Under the final step of *McDonnell Douglas*, Plaintiff must offer evidence that PGW's decision to fire Plaintiff for TLM infractions was a pretext for age discrimination.  Plaintiff may

---

[3] Although we need not continue the analysis, we will address the three-step framework of *McDonnell Douglas* to establish the firm basis on which our decision rests.

do so by (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. *See Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994). "Pretext is not demonstrated by showing simply that the employer was mistaken." *Sempier,* 45 F.3d at 731 (citing *Ezold v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 531 (3d Cir. 1992)). Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Fuentes,* 32 F.3d at 765 (alteration in original) (citations and internal quotation marks omitted).

To discredit PGW's proffered reasons for his termination, Plaintiff argues that PGW's decision to allow him to return to work after the TLM investigation and coinciding suspension essentially eliminates the time violations as a basis for his termination. (Pl.'s Opp. Br. 14.) In addition, Plaintiff asserts that because he had permission from his direct supervisor, Joseph Craig, to leave work on the dates in question, he satisfied all PGW TLM requirements. (*Id.* at 14-15.)

PGW conducted an investigation of Plaintiff for the suspected TLM violations that allegedly occurred on August 28, 2013 and September 13, 2013. (*Id.* at 14.) PGW concluded that Plaintiff left the work premises for extended periods of time on both dates without clocking out. (Grant Aff. Ex. M.) Failure to electronically record work stop and start times served as a basis for termination of all non-union employees. (Elec. Time Rec. Policy.) That PGW wavered in its decision whether to issue Plaintiff a stern written warning or terminate his employment does not establish pretext for discrimination. Furthermore, assuming that Plaintiff did receive

11

permission from his supervisor on both occasions for the work absences, such permission did not

relieve Plaintiff of his duty to properly record his work start and stop times.  Therefore, we are

satisfied that Plaintiff has failed to "demonstrate such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons

for its action that a reasonable factfinder could rationally find them unworthy of credence."

*Fuentes,* 32 F.3d at 765 (citations and internal quotation marks omitted).

       In an attempt to establish discriminatory animus, Plaintiff asserts that a PGW director

once stated that Plaintiff "had been at PGW probably far too long," and another executive once

asked "do you know how old [he] is?" about another employee over 40.  (Pl.'s Opp. Br. 9.)

Rather than a statement as to Plaintiff's age, the first statement could easily be interpreted to

mean that Plaintiff had become too comfortable or complacent in his job.  This is especially so

since that statement was made in the context of developing a performance improvement plan (*see*

Craig Dep. 36:1-7).  The latter question as to the age of another employee is offered as evidence

of discrimination without context.  The suggestion that this statement demonstrates age

discrimination in the work place without more is untenable.  "[T]he factual dispute at issue is

whether discriminatory animus *motivated* the employer, not whether the employer is wise,

shrewd, prudent, or competent." *Fuentes,* 32 F.3d at 765 (emphasis added) (citations omitted). [4]

Plaintiff's vague references to age, without more, do not establish a triable issue of fact.  When

viewed in the light most favorable to Plaintiff, we find nothing in the record from which to infer

---

[4] Plaintiff also argues that Defendant breached the subsequent settlement agreement out of age animus.  (*See* Pl.'s Opp. Br. 18-22.)  Defendant offered Plaintiff an alternative exit option, which would have reinstated Plaintiff's employment for one day and allowed him to retire with full benefits in lieu of termination.  (*Id.* at 19.)  Even if Defendant's decision to terminate the settlement agreement resulted in a breach of contract, we fail to see how such breach was motivated by a discriminatory purpose.  As we have already discussed, it was entirely within Defendant's right to terminate Plaintiff without a settlement option.

that discrimination motivated PGW's actions.  Summary judgment for PGW is therefore appropriate on Count I.

### B.        Breach of Contract (Count II)

In its Supplemental Motion for Summary Judgment (ECF No. 34), PGW requests that judgment be entered in favor of Defendant and against Plaintiff on Plaintiff's claim for breach of the settlement agreement in Count II of Plaintiff's Amended Complaint.

A party's refusal to execute a written document does not preclude enforcement of a settlement agreement. *See Kozierachi v. Perez*, No. 10-7570, 2014 WL 1378268, at *1, 3-4 (E.D. Pa. Apr. 8, 2014) (enforcing a settlement agreement despite one party's failure to execute it); *Bright v. First Senior Fin. Grp.*, No. 12-360, 2013 WL 3196392, at *7 (E.D. Pa. June 24, 2013) (same); *Kelly v. Boeing*, No. 09-2152, 2011 WL 2066620, at *2 (E.D. Pa. May 26, 2011), *aff'd,* 513 F. App'x 131 (3d Cir. 2013) (same).  Even in the absence of a written document, a settlement agreement becomes binding when the parties have mutually agreed to its terms and conditions. *See Pennsbury Vill. Assocs., LLC v. McIntyre*, 608 Pa. 309, 11 A.3d 906, 914 (Pa. 2011); *Kelly,* 2011 WL 2066620, at *2.  Once binding, a party's change of heart is insufficient to void that agreement. *See Thomas v. Univ. of Pa.*, No. 06-1916, 2007 WL 2891739, at *2 (E.D. Pa. Oct. 2, 2007) ("A settlement agreement is still binding even if it is clear that a party had a change of heart between the time he agreed to the terms of the settlement and when those terms were reduced to writing.") (citation and internal quotation marks and citation omitted); *Bershak v. Phila. Gas Works*, No. 1873, 2001 WL 193702, at *1 (E.D. Pa. Feb. 26, 2001); *see also Transp. Int'l Pool, Inc. v. Alt. Transp., Inc.*, No. 07-2895, 2008 WL 2550598, at *5 (E.D. Pa. June 25, 2008).

13

PGW first argues that any purported settlement agreement is unenforceable against PGW because it lacks a "designated signature." (Def.'s Supp. Summ. J. Mot. 6.) In support of this position, PGW cites 53 Pa. Stat. and Con. Stat. Ann. § 12671, a statute requiring public works contracts with private contractors to be signed by an authorized city representative. (*Id.*) PGW also cites *Smart v. Philadelphia,* 54 A. 1025 (Pa. 1903), an antiquated decision applying § 12671 to a city repaving contract and *Philadelphia Bd. of Educ.*, 12 Pennsylvania Pub. Employee Rep. ¶ 12343 n.5, 1981 WL 683912, which makes a footnoted reference to the statute in deciding the enforceability of a city collective bargaining agreement.

As we discussed in our Memorandum dated March 20, 2015, 53 Pa. Stat. and Con. Stat. Ann. § 12671 is applied narrowly and is not applicable to individual agency employment contracts. Citing appropriate authority, we concluded that PGW's argument was unpersuasive. *See Sammons v. Philadelphia Gas Works*, No. 14-2419, 2015 WL 1383581, at *2 (E.D. Pa. Mar. 20, 2015). Moreover, as the Pennsylvania Commonwealth Court stated in the case of *McGaffic v. City of New Castle*:

> [I]t is well settled that contracts which are within the scope of the corporate powers but not authorized by proper action of the municipal corporation may be ratified by the proper corporate authorities . . . [through] affirmative action of the proper officials, or by any action or **nonaction which in the circumstances amounts to an approval of the contract**.

973 A.2d 1047, 1054 (Pa. Commw. Ct. 2009) (internal quotations and citations omitted) (emphasis in original).

In *Bershak v. Philadelphia Gas Works*, PGW took the position that an executed settlement agreement withheld by a former employee was enforceable. No. 001873, 2001 WL 193702, at *1 (E.D. Pa. Feb. 26, 2001). In concluding that the agreement was indeed enforceable, the Court reasoned that a "settlement agreement need not be reduced to writing to

14

be enforceable." *Id.* Such reasoning may be less convenient to PGW here than it was when *Bershak* was decided in 2001, but it rests upon sound legal principles. *See, e.g., Good v. Pennsylvania, R. Co.*, 384 F.2d 989, 990 (3d Cir. 1967) ("The settlement agreement which was entered into by duly authorized counsel expressed the intention to settle the case for the agreed amount and was valid and binding despite the absence of any writing or formality."); *Pugh v. Super Fresh Food Markets, Inc.*, 640 F. Supp. 1306, 1308 (E.D. Pa. 1986) ("[A] settlement agreement is still binding even if it is clear that a party had a change of heart between the time he agreed to the terms of the settlement and when those terms were reduced to writing."); *see also In re NuNet, Inc.*, 348 B.R. 300, 310 (Bankr. E.D. Pa. 2006) ("A written contract which has not been signed by one of the parties will nevertheless create a valid, binding agreement if both parties manifest their assent to its terms, and the essential terms of the contract are settled" (citations omitted)); *Shovel Transfer & Storage, Inc. v. Pennsylvania Liquor Control Bd.*, 739 A.2d 133, 138 (Pa. 1999) ("Where the parties have agreed orally to all the terms of their contract, and a part of the mutual understanding is that a written contract embodying these terms shall be drawn and executed by the respective parties, such oral contract may be enforced, though one of the parties thereafter refuses to execute the written contract." (internal quotation marks and citation omitted)). We are satisfied that if Plaintiff and PGW did in fact enter into an agreement regarding Plaintiff's retirement, it can be enforced even absent a signed writing.

PGW alternatively argues that mutual assent cannot be established because no authorized PGW agent agreed to the terms of the purported contract. (Def.'s Supp. Summ. J. Mot. 7-8.) PGW asserts that "[i]t is the consistent policy and practice at PGW that General Counsel has sole authority to approve contracts and agreements on behalf of PGW and no other attorney representing PGW has this authority without her express approval." (*Id.* at 8.) Chief

15

Administrative Officer and General Counsel for PGW, Abby L. Pozefsky, has stated in a sworn affidavit that "[a]lthough [she] was aware of the general outline of the proposed settlement, [she] did not have the opportunity to review the proposed agreement."  (Pozefsky Aff. ¶ 10, ECF No. 34-1.)  PGW further contends that an email chain between counsel demonstrates that the proposed agreement was never ratified and its terms never made final.  (Def.'s Supp. Summ. J. Mot. 9-10.)  Plaintiff argues that the essential terms of the bargain were settled and agreed upon as evidenced by the written Agreement dated December 31, 2013, and Plaintiff's partial performance of the Agreement when he signed "all necessary documentation prepared by PGW to submit his retirement."  (Pl.'s Opp. Br. 31.)

When viewed in the light most favorable to Plaintiff, the record supports the conclusion that no issues of material fact remain as to whether PGW assented to the proposed settlement agreement.  On December 31, 2013, Mr. Lebofsky, counsel for PGW, wrote an email in which he stated, "I need some method for you to review the revised agreement to enable your client to retire today and have it become effective tomorrow, January 1."  (Dec. 31, 2013 Lebofsky email.)  In addition, counsel wrote, "I will have to have your approval before I present the revised agreement to Mr. Sammons."  (*Id.*)  A rational factfinder would reasonably interpret such language to mean that PGW had already ratified the settlement proposal, and only Plaintiff's approval was needed to finalize the deal.  Plaintiff's act of compiling and signing all necessary documentation and attending the meeting with human resource representatives on the morning that his retirement was to be finalized is a clear manifestation of his assent to the contract.  *See Luden's Inc. v. Local Union No. 6 of Bakery, Confectionery & Tobacco Workers' Int'l Union of Am.*, 28 F.3d 347, 355 (3d Cir. 1994) ("[A]ssent may be manifested by words or other conduct." (citing Restatement (Second) of Contracts § 4 cmt. a (1981)); *see also Shovel Transfer &*

16

*Storage, Inc.*, 739 A.2d at 139 ("[T]he parties, with the capacity to contract, clearly manifested assent to the terms of the contract through their conduct.  Thus, the instant contract should be enforced, even though the officials refused to sign the written instrument.").

PGW's final argument is that Plaintiff's alleged fraudulent misrepresentations about his marital status render the settlement agreement voidable.  (Def.'s Supp. Summ. J. Mot. 10-11.)  A settlement agreement may be set aside only with "a clear showing of fraud, duress, or mutual mistake."  *Pennsbury,* 11 A.3d at 914; *Kozierachi,* 2014 WL 1378268, at *3.

> Under Pennsylvania law, fraud consists of the following elements: (1) a
> representation; (2) which is material to the transaction at hand; (3) made falsely,
> with knowledge of its falsity or recklessness as to whether it is true or false; (4)
> with the intent of misleading another into relying on it; [and] (5) justifiable
> reliance on the misrepresentation . . . .

*Giannone v. Ayne Inst.*, 290 F. Supp. 2d 553, 566-67 (E.D. Pa. 2003) (citing *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994)).  "Matters of misrepresentation, knowledge, reliance, causation, and scienter are questions of fact."  *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 276 (3d Cir. 2010) (citations and internal quotation marks omitted).

Although PGW submits a health plan reapplication form from 2003 showing that Plaintiff made a representation of being married three months after his divorce (Healthcare Reapplication Form, ECF No. 18, Ex. B), PGW also admits that in 2009 Plaintiff indicated that he was divorced on a work-related form (Ambrose Aff. ¶ 24.  PGW makes no argument as to how it justifiably relied on Plaintiff's 2003 misrepresentation in negotiating the 2013 settlement agreement, except to say that it was unaware that it had in its possession more current paperwork that accurately reflected Plaintiff's marital status.  (Ambrose Aff. ¶ 24.)  Furthermore, the fact that Plaintiff removed his wife as a medical plan beneficiary in 2006 and accurately represented his marital status in 2009 raises serious questions as to his intent to fraudulently induce PGW to

enter into the settlement agreement.  Consequently, summary judgment on Count II of the Amended Complaint would be inappropriate.

### C.    Fraud (Counterclaim)

In his Cross Motion for Summary Judgment (ECF No. 36), Plaintiff requests that judgment be entered in favor of Plaintiff and against Defendant on PGW's Counterclaim alleging fraudulent misrepresentation of his marital status.

Plaintiff asserts that the counterclaim is not pleaded with enough particularity to satisfy the requirements of Fed. R. Civ. P. 9(b).  Rule 9(b) requires that a party alleging fraud "must state with particularity the circumstances constituting fraud or mistake."  "Although Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'"  *In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002) (quoting *In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp. 2d 551, 577 (D.N.J. 2001)).

Here, PGW alleges that Plaintiff and his ex-wife divorced on March 24, 2003. (Countercl. ¶ 12, ECF No. 29.)  It asserts that Plaintiff defrauded PGW when he continued to seek medical plan benefits for his ex-wife.  (*Id.* at ¶ 13.)  It is alleged that he affirmatively sought benefits for his ex-wife when he listed her name and other identifying information on an August 31, 2003 healthcare reapplication form.  (Ambrose Aff. ¶ 16.)  PGW alleges that the fraud lasted from March 24, 2003 to August 31, 2009.  (*Id.* at ¶ 14.)  PGW does not believe that it received Plaintiff's divorce decree until December 31, 2013[5] (Ambrose Aff. ¶ 18) and Plaintiff "has no recollection of the date [that] he turned his divorce decree in to PGW" (Pl.'s Opp. Br. 37).  As a

---

[5] Paragraph 17 of the Counterclaim lists the date as December 31, 2014, which, based upon the evidence and other factual assertions, we believe to be in error.

18

result of Plaintiff's alleged fraud, PGW alleges $25,975.20 in damages.  (Countercl. ¶ 20.)  We are satisfied that PGW's counterclaim is pleaded with sufficient particularity to substantiate its allegation of fraud.

Plaintiff next argues that even if PGW's counterclaim is pleaded with sufficient particularity, it is barred by a two-year statute of limitations because PGW knew or should have known that Plaintiff was divorced by August 31, 2009.  (Pl.'s Opp. Br. 38.)  Under Pennsylvania law, a claim for fraud is subject to a two-year statute of limitations.  42 Pa. Stat. and Cons. Stat. Ann. § 5524(7); *see also Berkery v. Verizon Commc'ns, Inc.*, No. 15-1085, 2015 WL 6599694, at *3 (E.D. Pa. Oct. 29, 2015) ("Pennsylvania has a two-year statute of limitations for fraud." (citation omitted)).  Although an aggrieved party may not have discovered the alleged fraud until a much later date, they "must still bring their claim within two years of when they learned or should have learned, through the exercise of due diligence, that they have a cause of action." *Beauty Time, Inc. v. VU Skin Sys., Inc.*, 118 F.3d 140, 148 (3d Cir. 1997).  However, "[w]hen the events underlying a plaintiff's cause of action sound in fraud or deceit, 'that, without more, will toll the statute of limitations until such time as the fraud has been revealed'" *Bishnu v. Monumental Life Ins. Co.*, No. 04-3617, 2007 WL 1030477, at *7 (E.D. Pa. Apr. 2, 2007) (quoting *Beauty Time*, 118 F.3d at 144).

Here, it is asserted that PGW learned of Plaintiff's divorce at the latest on August 31, 2009, when it received paperwork from Plaintiff indicating such.  (Pl.'s Opp. Br. 38.)  Although knowledge of the divorce can be imputed to PGW as of this date, such knowledge, without further inquiry, would not reasonably lead PGW to discover that it had been defrauded by Plaintiff from 2003 to 2006.  However, because PGW's own policy required employees to terminate coverage for an ex-spouse within 30 days of divorce and provide a copy of the divorce

19

decree (June 22, 2003 Mem.), due diligence required PGW to make further inquiry into the specific date of the divorce decree once it was on notice that Plaintiff was no longer married. *See Beauty Time*, 118 F.3d at 144 ("[T]here are few facts which diligence cannot discover, but there must be some reason to awaken inquiry and suggest investigation" (citing *Urland v. Merrell-DowPharms.*, 822 F.2d 1268, 1271 (3d Cir. 1987)).  Obviously no further inquiry was made here.  The two-year statute of limitations therefore ran from 2009, rendering PGW's counterclaim untimely.  PGW's Counterclaim will be dismissed as time-barred.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion will be granted, and Defendant's Motions will be granted in part and denied in part.

An appropriate Order will follow.

**BY THE COURT:**

_____

**R. BARCLAY SURRICK,   J.**

20